## HAVERHILL AQUEDUCT CO. *v.* PAGE.

The plaintiff fixed the rates for water at $10 per year, and afterwards raised the rates for the same amount of water to $12 per year, to commence March 1, 1870, and notified the defendant and others interested, but the defendant did not assent. The rates were paid in advance for the year on March 1. When called upon March 1, 1870, the defendant offered $10, and refused to pay any more for the year. This the plaintiff refused to receive, but let the water run to the defendant's house as before for two years, and brought this suit to recover the $12 per year and interest. The defendant tendered $10 per year and interest, and pleaded the general issue as to the residue. *Held*, that the plaintiff could not recover more than the amount tendered.

ASSUMPSIT on the common counts, by the Haverhill Aqueduct Co. against Nathaniel M. Page. The plaintiff relied upon the following account annexed : " Nathaniel M. Page to Haverhill Aqueduct Company, Dr.,—1871, Sept. 2, to use of water from said company's aqueduct, for the year commencing March 1, 1870, ending March 1, 1871, payable March 1, 1870, $12 ; to interest on same one year and six months, $1.08 ; to use of water from said company's aqueduct for the year commencing March 1, 1871, ending March 1, 1872, payable March 1, 1871, $12 ; to interest on same six months, 36 cents,—25.44." Writ dated September 2, 1871. The defendant confessed $21.35, and pleaded the general issue to the residue. The court reserved the questions arising upon the following report of an arbitrator appointed by agreement of parties :

" The plaintiffs were incorporated under an act of the New Hampshire legislature, approved June 12, 1835, and made a corporation for the purpose, as appears by their charter and the articles of association, signed by most of the corporators May 20, 1835, of furnishing themselves and other inhabitants of Haverhill Corner with water to be taken from the Bliss spring, so called, in said Haverhill. The corporators, under that charter, organized June 22, 1835, and adjourned to June 24, 1835, on which last named day by-laws were adopted by which the capital stock was fixed at $1,600, to be divided into sixty-four shares of $25 each, and that the officers of the corporation consist of not more than three directors, a clerk, treasurer, and superintendent, ' to hold their office for one year, and until others are chosen in their place.' The corporation proceeded to purchase said Bliss spring of water, and the right to convey the same, and laid down an aqueduct bringing the water to Haverhill Corner, about three fourths of a mile, at an expense of about $1,600, the same season. Only fifty-six shares were taken and paid for that year. Some two years after, five more shares were paid for, making the capital stock consist of sixty-one

shares, which has remained so ever since. February 4, 1836, an assessment of $3 per share was made and paid in, on the shares or stock then issued, making the par value of the shares $28 each. The by-laws in regard to the number of directors were changed several times, the last of which changes was made January 1, 1842, when they voted to have but two directors; which by-law has remained unaltered. The annual meetings of the corporation were held regularly on the first Tuesday of January in each year, up to and including January, 1854, except in one instance, when, it having been passed by, it was called by a justice of the peace. No meetings were held from January, 1854, when John L. Rix and Phineas Spaulding were chosen directors, until January 5, 1864,—the officers elected in 1854 acting as such up to January 5, 1864, which meeting was called by their clerk, Hon. N. B. Felton, who has been clerk of the corporation ever since its organization. At that meeting Phineas Spaulding and George W. Chapman were chosen directors, Phineas Spaulding, treasurer, and Michael Carleton, superintendent, who have severally acted as such officers up to the present time, no meeting having been held since then. The directors never made or kept any records of their acts or votes whatever, and no written contracts were made with the water takers, and there is nothing upon their books showing what the rate or charge for water was, except what is to be inferred from the credits made by the treasurer. But your referee finds, from that and other evidence, that at the commencement of the enterprise the corporation laid down the branch pipes from their main pipe to the cisterns of their customers, but did not furnish the cisterns, and charged $5 per year, payable on March 1 of each year, in advance, for what they termed a two-barrel gauge, and at that rate for a larger quantity; and payment has ever since been required in advance. After some years they required their customers to be at the expense of their branch pipes from the main pipe aforesaid to their cisterns, and they have conformed thereto. The charge or rate for the water remained unchanged until March, 1869, when the directors decided to charge $6 for what they had charged $5 for, and in the same proportion for a larger quantity, commencing March 1, 1869, and made out and presented their bills at that rate, and collected a small portion thereof; but strong objections being made against having the price raised without notice, they decided to collect only the old rates for that year, and paid back what they had collected over that, at the same time notifying their customers verbally that the price for the year, commencing March 1, 1870, would be $6 for the two-barrel gauge, and in that proportion for a larger quantity, which notice was given by Dr. Spaulding, who was director and treasurer, with the approval of Geo. W. Chapman, the other director. I do not find that any contract was ever made by the defendant in this case, or any other of the water takers, by which they agreed to take and pay for water only from year to year, or that the plaintiffs ever agreed to furnish it for any definite time; and when buildings ceased to be occupied where they had been supplied by the plaintiffs, the water was

stopped, and pay also. The defendant in this case owns and occupies the premises where the Columbian hotel stood, which was destroyed by fire in the spring of 1848, and the buildings now owned by the defendant were built thereon, about five years after that, no water being used there or paid for during the intervening time. Upon the erection of the present buildings thereon and their occupancy, the owners took water from the plaintiffs' aqueduct, at both house and barn, paying $5 per year for each place up to the time the defendant purchased, April, 1861; and he continued to do the same up to March, 1870, being $10 per year, when the plaintiffs charged him $12 per year, and he refused to pay the additional $2. There was some conflict in the testimony as to whether the defendant was notified by Dr. Spaulding, who was director and treasurer, before March 1, 1870, that the plaintiffs would claim of him the $2 advance in the price; but I find that such notice was given him, before that time, of the claim of the plaintiffs to advance the price to be charged him $2 per year after March 1, 1870, but never assented to by him; and when called upon for payment, he refused to pay any more than $10, which they declined to accept.

The supply of water for the years 1870 and 1871 was not up to the average for the previous years, on account of the unusual dry seasons, and the defendant was at times rather short of water; and a portion of the time it stopped, caused by frost, or some other trouble with *his* branch pipe, which was without any fault of the plaintiffs. The plaintiffs have, within a few years, furnished water to more places than they did formerly, with the right to discontinue the same if their supply of water should be short, which, if it has operated to the injury of some of the water takers, I do not find that the defendant has suffered by it materially, if at all.

The corporation have made, in all, thirty-six dividends to their stockholders, on sixty-one shares, except the first one, which was on fifty-six only—the first, of September, 1837, and the last, of March, 1871. The first dividend was $4.50 on a share, and the three last ones $2.25 each. There were two of 3.50 each, one of $3.33, two of $2.67, ten of $3, fifteen of $2.50, four of $2.25, and one of $2; making the dividends from the commencement amount to $98.67 per share, which makes them average about $9\frac{1}{4}$ per cent. The main pipe has not been relaid to any great extent since it was first put down in 1835, and must necessarily have depreciated considerably. Their spring house and appurtenances are in a good state of repair. The officers of the corporation have never made any charge for their services as such, except the treasurer and superintendent.

The referee finds that if, from the foregoing statement or finding of the facts in the case, the court are of the opinion that the plaintiffs had the right to advance their charge for water to the defendant, then they are entitled to recover the amount of the account aforesaid, with the interest charged therein; otherwise, the amount confessed is all they are entitled to.

*Chapman* and *Felton*, for the plaintiffs.

*Bryant, Westgate,* and *Binghams,* for the defendant.

SARGENT, J.  We do not see anything in the facts, as reported by the auditor, that tends to show that the plaintiff corporation are not in a proper state and condition to do the business they were intended to do,— to maintain suits and all other legitimate business.  The fact that their elections have not been holden every year is immaterial, since, by the provision of their by-laws, their officers are " to hold their office for one year, and until others are chosen in their place."  *Parsons* v. *Powder Works,* 48 N. H. 68 ; *Boston Glass Co.* v. *Langdon,* 24 Pick. 49, 54.

Nor do we see anything in the case, as stated by the auditor, that shows that there was any permanent contract between these parties, or anything more than an agreement from year to year.  The auditor is, no doubt, correct in his conclusions on that point.

The defendant admits that he used the water that ran through the company's pipes, and through the gauges upon his premises, during the time charged for ; and the only question is, whether he shall pay $10 or $12 per year for the use of this water.

The referee finds that in 1869 the directors decided to charge $6 for the same amount of water for which they had charged $5 before, and it was finally determined that this change should take effect March 1, 1870, and the consumers were notified accordingly ; and the case finds that this defendant was notified prior to March 1, 1870, of the contemplated change.  The case finds that the defendant did not assent to this change, but it does not find that he dissented when he received the notice, and perhaps that is not material.  But it seems that he had concluded not to pay the advanced rates, when, on March 1, 1870, he was called upon to pay in advance for that year.  Then he refused to pay the $12 per year, but stated what he would pay, and the most he would pay ; and we think that the company, upon his refusal to pay the advanced rates, should have stopped the water from flowing to his premises, as they were authorized to do by their by-laws.

We have no doubt the plaintiff company might properly raise these rates ; and, so far as appears, it was properly done by the directors, though the case does not fully show what their powers and duties were. If they acted within the scope of their authority in this matter, as we presume they did, their action was proper.  The company have the right, in some way, to regulate that matter, and, if the power is conferred specifically upon the directors, or if it is included among the general powers with which they are vested, then it has been properly exercised.  Assuming that to be so, we are led to examine the contract which was made, if any was made in this case.  So far as words went, there was no agreement between them.

Nor was it a case precisely parallel to that of *N. H. I. F. Company* v. *Richardson,* 5 N. H. 294, though that case is pretty directly in point. There, all the talk that was had about a change in the terms of the contract at the end of the first year, was had at the commencement of that

year. At the commencement of the second year the subject was not alluded to, but the services were rendered for the second year by the defendant, upon the strength of his offer to work the first year for $800, but that if he stayed the second year he must have $1000. The plaintiff accepted the first part of the proposition, to pay $800 for that year, but expressly declined to make any pledge beyond that year. The defendant worked two years, and claimed $1000 for the second year. But the court held that as there was no contract only for one year, and the services continued without any new contract, the law implied that the parties understood that the old contract continued, as no attempt was made to make any new one.

Here there was an attempt on the part of the plaintiffs to make a new contract at the commencement of the year 1870. New terms and conditions were proposed, but they were not agreed to by the defendant. The plaintiffs demanded $12 as pay for the water that should run through the gauges for the year to come. The defendant utterly refused to pay that sum, but offered to pay the same rate as before, which the company refused to receive. Here was no new contract, then, made in words, though it must have been apparent to both parties that the old contract was at an end. The plaintiffs had terminated the old contract, and given notice to that effect to the defendant. The defendant had refused to make any new contract, but would pay the same as before, and nothing beyond that. So far, then, there is no contract. But let us look at the acts of these parties—" acts" which " speak plainer than words." The defendant had said, I will pay you $10, and no more, for the year; at that price you may let the water run, and I will pay for it. Otherwise, I do not want it, and will not pay for it. The plaintiffs say, We will not take your $10 ; we must have $12, or we will not supply you. They separate ; but the plaintiffs, having the control of the water, and the power to let it run where they choose and to stop it when they choose, for non-compliance with their terms, do not cut off the defendant's supply of water, but let it run on through that year and through the next, with nothing more said about it.

Their conduct can receive but one interpretation. Having received the defendant's offer, although at first they refused to accept it, yet by their acts they have accepted it. They have supplied the defendant with water for the year, when they had it in their power to do so or not, after they had received his most favorable terms.

The case would stand, as we conceive, like this: A employs B to work for him for one year for $100. At the end of the year B notifies A that he shall not work any longer at that price, but that he will stay the second year for $120. A says he will not pay more than $100 for the second year; that he will pay that sum, and no more; and that B may remain and work for $100 or not, just as he pleases ; he will pay no more. Nothing more is said between them, and B goes on and works the second year as before. We think there could be no trouble in giving construction to that contract. Though B had refused to work longer at the same rate, still, when he found that the only alter-

native was to remain at the same rate, or not to remain at all, and he finally remains and works, the inference is irresistible that, whatever he may have *said*, he finally concluded to remain and work upon the terms offered him; and he certainly could recover nothing more.

In the case before us, the furnishing the water to the defendant, or the cutting off his supply, was a matter entirely in the hands and power of the plaintiffs, just as much as the performing of the service was entirely at the discretion of B, in the case supposed.   After the plaintiff company had failed to make the contract which they desired to make, there were only two things they could properly do: one was, to shut off the water that ran to the defendant's premises; the other was, to let him have the water upon his terms, and according to his offer.   The result shows which alternative the plaintiffs adopted. Their " acts speak plainer than their words."   There must be

*Judgment for the defendant.*

Doe, J.   Whether the inference, that might be drawn from the plaintiffs' allowing the water to go, that they understood the price was $10, would be a conclusion of fact not reported by the referee; whether the inference might be drawn, from the defendant's allowing the water to come, and using it, that he understood the price was $12, *(Fogg* v. *Portsmouth Atheneum,* 44 N. H. 115); and whether the report should be recommitted for the referee to draw the right inference of fact from the acts of both parties, or, failing to find a price, fixed by a mutual understanding, actually existing in the minds of the parties, or existing in contemplation of law by force of an estoppel, to find what the water was worth, and what the plaintiffs reasonably deserved to have, *quære.*